**LONE STAR STEAKHOUSE AND SALOON, INC. and Lone Star Steakhouse and Saloon of Michigan, Inc., Plaintiffs,**

v.

**LIBERTY MUTUAL INSURANCE GROUP and Liberty Mutual Fire Insurance Company, Defendants.**

**No. 02–1185–WEB.**

United States District Court, D. Kansas.

Oct. 19, 2004.

Brian C. Henderson, Gary Davis, Crowe & Dunlevy, Oklahoma City, OK, Martin W. Bauer, Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KS, for plaintiffs.

Michael F. Schmidt, Harvey Kruse, P.C., Troy, MI, Patrick J. Murphy, Wal-

lace, Saunders, Austin, Brown & Enochs, Chartered, Wichita, KS, for Defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This matter is before the court on defendant Liberty Mutual's[1] Motion for Summary Judgment, and upon motions in limine filed by both sides. The court finds that oral argument would not assist in deciding the issues presented.

### I. Background.

Lone Star operates a restaurant in Battle Creek, Michigan. As part of the construction of the restaurant, Lone Star built and maintained a storage basin on its property to handle storm water runoff. Battle Creek Hospitality, Inc. ("BCH") operated a Holiday Inn Express on the property next to the restaurant. In 1998, BCH filed suit against Lone Star alleging that overflow from Lone Star's water basin damaged Battle Creek's property ("the 1998 case"). The 1998 case was eventually settled for $95,000. Defendant Liberty Mutual, which had issued a commercial general liability insurance policy to Lone Star, paid the full amount of this settlement. Shortly after settlement of the 1998 case, BCH filed a second action against Lone Star ("the 2000 case") alleging additional flooding incidents and seeking damages in excess of $6,000,000. Liberty Mutual provided a defense for Lone Star but eventually sent reservation-of-rights letters to Lone Star indicating there were questions about coverage under the policy. Liberty Mutual subsequently denied coverage for the BCH 2000 claims. Lone Star then settled the 2000 case with BCH for $890,000.

---

1. For purposes of this opinion, the defendants are collectively referred to as "Liberty Mutual" and the plaintiffs are referred to as "Lone Star."

Lone Star filed the instant action claiming that Liberty Mutual's failure to contribute to the settlement of the 2000 case was a breach of its contract of Commercial General Liability Insurance. Lone Star further claims Liberty Mutual breached an implied covenant of good faith and fair dealing by applying exclusions not contained in the policy, by knowingly misconstruing policy provisions, by not attempting in good faith to effectuate a prompt and fair settlement of the claims in the 2000 case once liability had become reasonably clear, and by forcing Lone Star to retain counsel to secure benefits to which Liberty Mutual knew Lone Star was entitled under the policy.

Defendant Liberty Mutual now moves for summary judgment on three grounds, all of which stem from its contention that Lone Star was aware of the inadequacy of its drainage system but failed to take steps to halt the ongoing flooding of the neighboring property. First, Liberty Mutual argues there was no "occurrence" within the meaning of the policy. Second, it contends coverage is barred by an exclusion for property damage "expected or intended" by the insured. And third, it argues Lone Star's claim is barred under the "loss in progress" or "known loss" doctrine.

This dispute is between citizens of different states and the amount in controversy exceeds $75,000. Accordingly, the court has subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332(a)(1).

II. *Facts.*

The court finds the following facts are uncontroverted for purposes of summary judgment. In keeping with the standards governing summary judgment, any facts in the parties' briefs not properly supported by the record have been excluded from the following statement. Also, any matters as to which the record discloses a genuine dispute of fact have been construed in the plaintiff's favor for purposes of determining whether the defendant is entitled to judgment as a matter of law.[2]

1. Lone Star retained Wolfgang Doerschlag Architects (hereinafter referred to as "WDA") to provide consulting engineering services for the restaurant construction.

2. Lone Star was advised by correspondence of January 8, 1997 from WDA of four options for controlling storm water runoff from its property. One of the options involved installation of a water detention basin. Def. Exh. 6.

3. On February 25, 1997, the City of Battle Creek Building Inspection Division noted upon reviewing the Lone Star site plan that the drainage pattern in the Lone Star parking lot, from south to north, "could allow runoff to flow north beyond the [Lone Star] property line and onto the adjacent hotel property during heavy rainfall. A berm or curb should be used to deflect the flow into the proposed channel." Def. Exh. 7.

4. The WDA drainage plan of March 4, 1997, included installation of a detention basin at the rear—or north—end of the Lone Star property to collect the storm water where it was supposed to infiltrate into the soil. The Plan stated:

The design of this site proposes the construction of a 5700 s.f. building with a 38,717 s.f. parking lot. The water will sheet flow to a detention basin at the rear of the lot where the water will

**2.** Liberty Mutual's Response Brief in this case includes a 32–page statement of additional facts. This statement is not concise (*see* D. Kan. R. 56.1), it ignores evidence in the record contrary to the assertions made therein, and to a large degree it is repetitious of Liberty Mutual's opening brief.

infiltrate into the soil. This basin has 6144 c.f. of storage at 2' of depth. These calculations show that we need 3837 c.f. of storage for a 100 year storm. Therefore, we have more than adequately designed for a 100 year storm. Also, we have improved drainage in both our immediate vicinity and in the "Christy Drain" watershed. We have eliminated any drainage problems the hotel site to the north of us was experiencing because the water is contained on our site and no longer sheet flows directly toward their building. The already overfull "Christy Drain" will not have to accommodate our 1.43 acres as, again, we are containing 100% of our runoff onsite where the water will infiltrate into the soil.

Def. Exh. 8.

Lone Star had just closed its purchase of the property and had not done any work on it at the time of the aforementioned proposal by WDA. The reference above to drainage problems therefore relates to the condition of the property prior to improvements by Lone Star.

5. City of Battle Creek engineer Robert D. Tarbell reviewed the WDA Drainage Plan and prepared a "Drainage Review" memorandum of March 4, 1997, noting that because the plan did not provide for any off-site discharge of storm water, the on-site retention basin "must be sized to contain 100% of the run-off." Tarbell calculated that the required volume for a 100–year, 24–hour storm would be 19,985 c.f. and that the volume provided by the WDA Plan of only 6,144 c.f. was "inadequate."

At the time of this plan, there was no City of Battle Creek regulation or policy requiring retention of all rainfall for a 100–year storm. Def. Exh. 22.

Lone Star was not aware of Tarbell's memorandum until approximately October 1998, after the filing of the 1998 lawsuit. Pl. Exh. C at Pp. 61–62. Liberty Mutual received a copy of the memorandum in November 1998. Pl. Exh. D.

6. On July 15, 1997, Battle Creek Hospitality ("BCH") complained that water from Lone Star's parking lot was flowing over the retention pond and onto BCH's property. It further claimed the Lone Star parking lot was with a slope toward the BCH property, resulting in excess water coming down onto the BCH lot. Def. Exh. 10.

7. On September 18, 1997, WDA reported to Lone Star that during an inspection on September 10, 1997, there was standing water in the detention basin and in the area between the basin and the BCH hotel building. The engineer making the report attributed the poor drainage to existing conditions which were further heightened by the development of the Lone Star property. He that noted a number of pre-development conditions indicated poor drainage on the hotel property, including the slope of the Lone Star property (prior to development), the presence of non-absorbent clay under the topsoil, that fact that the existing drains and storm pipe around the hotel were filled with sediment and were no longer in use, and the drainage of water into the area from the hotel roof. He stated that although the Lone Star drainage plan was designed according to code and was approved by the city and the hotel, "the overall drainage design appears to be contributing to the standing water at the hotel." Def. Exh. 11.

WDA proposed a temporary solution to the problem that involved extending the detention basin onto the BCH property and piping from the extension to an existing catch basin attached to the city system. *Id.*

8. In a letter dated February 20, 1998, concerning BCH's complaint, Lone Star representative Karon Perrill stated that Brent Allison (an agent of Lone Star) had recently visited the site and reviewed the drainage situation. Perrill conceded that "the area is an absolute mess and the drainage needs to be remedied," but said the problem was that runoff from the BCH lot and surrounding property was flowing into Lone Star's lot and causing its detention pond—which was designed only to handle runoff from Lone Star's property—to overflow. She said that Lone Star was not willing to spend any more money on the site and requested that Raxit Shah [the owner of the BCH property] take the necessary steps to remedy the drainage problems on his site. Def. Exh. 12.

9. On July 23, 1998, BCH sent correspondence to Lone Star complaining that since construction of the Lone Star restaurant and water detention basin, water had been flowing from Lone Star's property onto BCH's property, damaging the hotel's property, rooms, and business. Def. Exh. 13.

10. On July 27, 1998, Karon Perrill of Lone Star responded to BCH, again asserting that water from the hotel and other surrounding property was draining into Lone Star's detention basin and that the basin was designed to drain only Lone Star's lot. Perrill said that if the hotel corrected its drainage problem, Lone Star would clean up the detention pond. She said Lone Star's position was that its site was developed in accordance with approved engineering drawings and that the existing drainage problem was a result of the hotel's topography and lack of a sufficient system for storm water.

11. On July 28, 1998, BCH's attorney wrote Lone Star a letter complaining that the water detention basin was not retaining the water runoff from Lone Star's parking lot, that the water had been overflowing onto BCH's property, creating a swamp-like area and damaging the hotel. The letter stated that the basin had not been properly maintained and was filled with tall grass, weeds, and insects. It demanded that Lone Star immediately rectify the water drainage problems. Def. Exh. 15. Liberty Mutual was aware of the allegations in the letter.

Prior to July 28, 1998, BCH constructed a "water retaining wall" on its property.

*First Lawsuit.*

12. BCH filed suit against Lone Star on August 4, 1998 (the "1998 case"). The complaint alleged that the water drainage problems were caused by Lone Star's installation of an inadequate water detention basin, which caused water to overflow onto BCH's property. Def. Exh. 16.

13. The complaint contained five counts: General Allegations, Breach of Contract, Nuisance, Trespass, Damage to Parking Lot, and Permanent Injunctive Relief. The count entitled "Damage to Parking Lot" contained an allegation that Lone Star's pumping of water into BCH's parking lot constituted "either a trespass, or a negligent tortious act in disregard for the property rights of others."

14. On receipt of the summons and complaint, Lone Star tendered its defense to Liberty Mutual, who had issued a commercial general liability policy to Lone Star Steakhouse & Saloon, Inc., and which included as an additional named insured Lone Star Steakhouse & Saloon of Michigan, Inc. Def. Exh. 1.

15. The policy provided coverage to the insured for those sums the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which the insurance applies. However, the "bodily injury" or "property damage" had to be caused by an "occur-

rence" as defined by the policy. Def. Exh. 1 at 1.

16. The policy defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.*

17. The policy contained an exclusion for "Expected or Intended Injury":

This insurance does not apply to:

(a) Expected or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

18. Liberty Mutual assumed defense of the 1998 case without any reservation of rights. Pl. Exh. F.

19. Lone Star requested that the 1998 case be defended by attorneys of its own choosing; Liberty Mutual acceded and retained A. Benjamin Henson of Plunkett and Cooney, Bloomfield Hills, Michigan, to defend the case. This firm was on Liberty Mutual's approved counsel list and had been retained by them in prior cases.

20. On November 11, 1998, attorney Henson forwarded to Karon Perrill, Lone Star's real estate manager, a complete copy of the City of Battle Creek's engineering file, including Tarbell's Drainage Review of 3/4/97 indicating that Lone Star's water retention basin was only one-third of the size necessary to handle a 100–year rainfall. .

Mr. Henson supplied Liberty Mutual with this same information, and he emphasized the Tarbell memorandum in a letter to Liberty Mutual's claim representative on November 11, 1998. Pl. Exh. D.

21. Liberty Mutual and/or Plunkett and Cooney retained the consulting firm of McLaren Hart to provide an engineering evaluation of the storm water retention basin.

22. Robert Koltuniak of McLaren Hart submitted a proposal to Mr. Henson on February 5, 1999, outlining the services McLaren Hart would perform.

23. On April 21, 1999, Koltuniak sent attorney Henson a summary of some of his telephone conversations concerning the drainage issue. He included historical rainfall data for Battle Creek and noted that during 1997 and 1998 there had been no rainfall that approached a 100–year, 24–hour storm [i.e., in excess of 5 inches in 24 hours]. Def. Exh. 22.

Lone Star was aware in April/May 1999 that the basin did not have the capacity for a 100–year storm event, contrary to what Lone Star had been told by Wolfgang Doerschlag Architects when it designed the basin for Lone Star. Liberty Mutual was aware of this fact as well. Pl. Exh. E at LM 184.

24. One of Lone Star's goals in developing the property was to have between 125 and 130 parking spaces on the property. Pl. Exh. C at 10–11.

25. BCH listed as its expert Sergio DiPaolo, who according to interrogatory answers would testify that Lone Star failed to take into consideration the difference in elevation between the Lone Star and BCH properties, and that the retention pond was too shallow and small. Def. Exh. 23.

26. The 1998 case proceeded to mediation on August 19, 1999. BCH claimed that Lone Star should be liable for choosing and installing a retention pond that had proven inadequate and ineffective in preventing damage to the adjoining property.

27. Lone Star argued in its mediation summary that BCH's problems were

caused by drainage problems on BCH's own property, that the Lone Star basin was properly designed, and that BCH was estopped from making a claim by documents which BCH signed upon sale of the property to Lone Star. Def. Exh. 25.

28. The mediators awarded $95,000 to BCH. BCH had claimed damages in excess of $195,000. Attorney Henson evaluated the mediation award and reported to Lone Star and Liberty Mutual his views that BCH could establish liability for trespass and nuisance. He noted that Lone Star's own engineer expert agreed with the calculation of the Battle Creek engineer that the basin was only one-third of the required capacity and was not designed properly, and that if the case went trial BCH would have a jury view the site, which looked worse in person than in photographs. Def. Exh. 26.

Henson also noted that plaintiff's counsel claimed there was a continuing trespass of water from Lone Star's property to the BCH property, meaning that damages allegedly continue to accrue. He noted that if the mediation amount was accepted and paid, there would be a dismissal of the action, except perhaps for plaintiff's claim for permanent injunctive relief, which if granted by the court would require Lone Star to take remedial action, with its attendant expense, to comply with the court's order. *Id.*

29. Karon Perrill of Lone Star was aware of this evaluation, as was Liberty Mutual.

30. Liberty Mutual consented to pay the settlement in the amount of $95,000. It also paid for all of the defense costs and attorney's fees incurred by Mr. Henson in defending the 1998 case.

31. After accepting the mediation award, BCH moved for an order stating that BCH was not precluded from seeking to recover damages from Lone Star that were incurred subsequent to the mediation.

32. The court entered an order stating that "Plaintiff [BCH] is not barred from filing a new cause of action as a result of damages which are alleged to have occurred after ... September 20, 1999."

33. On November 4, 1999, Robert Koltuniak of McLaren Hart reported to Lone Star that McLaren Hart would prepare a proposal to design improvements to the storm water basin, noting that the original plan was to capture all site-related runoff where it would infiltrate into the ground. He stated in the proposal that since construction was completed, the pond "has not consistently prevented discharge of run-off onto adjacent properties."

34. Karon Perrill of Lone Star knew from McLaren Hart that Lone Star was not controlling the runoff from its property in November 1999. She was aware at the time of the settlement of the 1998 case in September of 1999 that water from Lone Star's property was trespassing on BCH's property.

35. Attorney Henson wrote BCH's representative on December 14, 1999, setting forth a site development plan drafted by McLaren Hart to address the drainage issue. It called for work to be done on the BCH property, including building a berm to the north of the detention basin, installing drains, and installing a manhole.

36. On January 24, 2000, BCH filed a second complaint against Lone Star (the "2000 case") alleging that Lone Star had constructed a water retention basin and had directed and channeled the surface water from the Lone Star property into the basin, but the basin had been ineffective in draining water, causing water to overflow onto BCH's property causing damage. The complaint contained three

counts: Count I—nuisance; Count II—trespass; and Count III—a claim for permanent injunctive relief. Def. Exh. 31.

37. The complaint did not specifically allege negligence, although the allegations of trespass and nuisance could include negligent conduct.

At the time of filing of the 2000 suit, Liberty Mutual was aware of the allegations of continued flooding and the steps taken by Lone Star. Liberty Mutual assumed defense of the case with no reservation of rights, and authorized Plunkett and Cooney to accept service on behalf of Lone Star. Pl. Exh. J. The next day, Plunkett and Cooney executed a "New File Form" concerning the 2000 lawsuit and indicated Liberty Mutual was the client. Pl. Exh. K.

38. The complaint was accompanied by a motion for a temporary restraining order arguing that Lone Star had failed to take any steps to prevent the continued trespass onto BCH's property.

39. On April 22, 2001, over fourteen months after service of the 2000 lawsuit, Liberty Mutual sent a reservation of rights letter to Lone Star. The letter advised that Liberty Mutual would provide a defense for the 2000 case but that an exclusion in the policy for "expected or intended injury" might apply and thereby preclude coverage. The letter stated that Liberty Mutual did not have sufficient information at that time to make a determination.

Liberty Mutual's internal policy provides that coverage determinations should be made within thirty days of receipt of a lawsuit. Pl. Exh. I at 122–23.

40. Liberty Mutual issued a second reservation of rights letter on March 25, 2002 advising that it was continuing to defend the action under reservation of rights. It stated that coverage may be barred by Exclusion (a) for Expected or Intended Injury and that the definition of "occurrence" may not have been met.

41. BCH's initial motion for temporary injunction in the 2000 case was dismissed. Karon Perrill of Lone Star was aware that water from Lone Star's property was continuing to enter BCH's property.

42. On February 28, 2000, Robert Koltuniak of McLaren Hart sent a report to Manu Bhatt, BCH's engineering expert, explaining Lone Star's proposal to extend the basin onto BCH's property, build a berm on BCH's property and construct a sewer from the detention basin onto BCH's property. The report indicated that McLaren Hart concurred with the City of Battle Creek's engineering office's calculation that volume of 20,000 c.f. was required for the basin to meet its design capacity of having enough volume to meet or exceed flooding from a single 100–year, 24–hour storm event. The report noted that proper maintenance was required to maintain adequate capacity of the basin. Koltuniak also noted that the City of Battle Creek did not have a storm water ordinance, design criteria, or standards for storm water design, but that based on sound engineering judgment design for a 100–year storm event was considered prudent. Koltuniak added, however, that "[t]ypically, stormwater conveyance structures are designed for lesser storms, say the 10–year, or 25–year storm event." Def. Exh. 35.

43. BCH rejected Lone Star's proposal. Among other things, BCH informed Lone Star that encroachment in the form of a berm on BCH land was unacceptable, but that BCH would cooperate with Lone Star to construct a new storm drainage line through BCH property to take drainage from the pond and other areas of the Lone Star site to the appropriate city storm sewer.

44. Koltuniak reported to Lone Star on March 3, 2000 that the plan was not acceptable to BCH. He further reported there had been continued flooding to BCH's property, that BCH was concerned about losing its Holiday Inn franchise, and that the Lone Star basin had very little capacity and would be in jeopardy of overflowing during any future storm due to considerable vegetative growth in the basin. Koltuniak recommended as an interim measure that the basin be pumped of standing water and excavated to remove vegetation. He also recommended temporary sand-bagging to restrict water flow onto the BCH property and a temporary high-capacity pump. Def. Exh. 38.

Koltuniak noted in his report that with regard to BCH's allegation of flooding in its pool and office area, field observations indicated that the flow from the Lone Star lot was not being entirely diverted to the detention basin in this area. He also noted, however, that Holiday Inn roof leaders and down spouts from the pool roof structure could be the primary cause.

45–47. On March 9, 2000, Lone Star dredged the basin two feet deeper than original depth and installed a concrete manhole to facilitate pumping of the basin. Additionally, Lone Star contracted with the excavator to pump the pond as needed to prevent discharge from the basin onto BCH's property. Def. Exh. 40.

On February 4, 2002, BCH alleged in a supplemental complaint that additional flooding had occurred on 11/1/99, 12/5/99, 2/27/00, 3/16/00, 4/2/00, 4/19/00, 5/9/00, 5/28/00, 6/13/01, and 8/22/01. Def. Exh. 39.

In June 2000 Lone Star extended and increased the size of the berm leading to the storm water basin. Pl. Exh. G at 81–85.

48. Because BCH rejected the McLaren Hart proposal (¶ 42 above), Lone Star did not attempt to implement the proposal. Defendants cite no evidence that Lone Star's alleged failure to dredge the basin again after March of 2000 caused any damages to BCH. In response to a complaint from BCH that flooding was coming from the east side of Lone Star's parking lot, Robert Koltuniak stated in correspondence dated May 19, 2000 that he saw no evidence that this was occurring. Pl. Exh. Z1.

49. In May of 2002, Lone Star completed additional improvements to the basin as part of the settlement of the 2000 case. When asked at her deposition to explain why the improvements were not completed before then, Karon Perrill of Lone Star noted that Lone Star had to find new engineers after McLaren Hart declared bankruptcy, and the new engineers had to get approval of the plans from the City of Battle Creek. Additionally, although no part of the improvements made by Lone Star in May 2002 was on BCH's property, Lone Star had to get a temporary construction easement and a permanent easement for maintenance of the basin from BCH.

50. BCH filed a second motion for preliminary injunction on April 26, 2000 alleging that Lone Star continued to flood and damage BCH's property. The motion was denied.

51–53. In response to the motion for preliminary injunction, the trial judge (Judge Kingsley) held a hearing and later visited the site with the parties. He recommended that Lone Star improve its existing berm and continue monitoring and pumping when needed, and that BCH tie down its guttering down spouts. Lone Star complied with the recommendation. Pl. Exh. G at 85. During the visit, the judge stated that his initial impression was that Lone Star was 60% at fault and BCH

was 40% at fault for the drainage problem. *Id.* at 23–24.

On June 13, 2000 BCH's attorney wrote to Benjamin Henson alleging that BCH had experienced flooding the previous night due to water from Lone Star's property. On June 14, 2000, Henson received correspondence from the excavator retained by Lone Star to monitor the pond. The letter stated that an employee of the excavator had been at the site at 4:00 am (the time of the alleged flooding) and saw that the berm was diverting water into the pond and no water from the Lone Star property was going around the berm; that water from the Holiday Inn roof was seen running between the berm and the Holiday Inn building; and that the pond was very full but was not overflowing. Pumping of the pond started around 4:30 am. Pl. Exh. O.

54. On October 24, 2000, Karon Perrill wrote Liberty Mutual a letter seeking approval to hire an engineer to survey the site. She reported that Lone Star's Director of Construction (Dru Coulson) met at the site with attorney Ben Henson and engineer Rob Barkholz, and all agreed that a survey showing the grades of the site was necessary for the engineers to calculate water runoff. She noted that Dru Coulson thought a survey would probably show that the hotel was actually channeling more water to the pond than Lone Star. Perrill admitted in her deposition that Coulson's opinion about what the survey would show later turned out to be incorrect. Def. Exh. 44; Def. Exh. 3 at 137.

55. Lone Star's contractor continued to monitor and pump the detention basin for the duration of the 2000 lawsuit after March 2000. Lone Star did not re-dredge the basin at any time after March 2000.

56. In connection with the 2000 lawsuit, attorneys Plunkett & Cooney prepared and filed responses to BCH's Requests for Admissions on December 28, 2000. The responses, which were based on information provided by Lone Star, denied that any water runoff from Lone Star's property flows onto BCH's property.

Although defendants contend Karon Perrill's deposition testimony shows the foregoing responses were false and that Perrill knew they were false, defendants ignore evidence in the record that supports a contrary inference. For example, as Lone Star points out, these responses were filed after Lone Star had taken remedial steps in March of 2000, including the dredging of the pond and contracting with Hoffman Brothers to monitor and pump the pond when necessary. The information Lone Star had in 1998 and 1999 says nothing about the effectiveness (or ineffectiveness) of these remedial measures. As to the condition of the pond after March 2000, there is evidence that Lone Star received a memorandum from Robert Koltuniak of McLaren Hart in June 2000, which was based on his review of a videotape of an alleged flooding incident in May 2000, which indicated there was no observed flow of water onto the BCH property. And Lone Star received a report from an employee of Hoffman Brothers who was at the site during an alleged flooding episode in June 2000 which indicated water from Lone Star was not running onto the BCH property. Thus, when the evidence is viewed in a light most favorable to Lone Star, as it must be on summary judgment, a jury could find that Lone Star's responses to the requests for admissions were not inconsistent with earlier information that it was likely causing a trespass on BCH's.

57. BCH filed a third motion for preliminary injunction on August 22, 2001 alleging that Lone Star had flooded BCH's property on that same date, and asking the court to restrain Lone Star from any fur-

ther trespasses. The motion was accompanied by photos showing flooding across the Lone Star property line onto the BCH property. Def. Exh. 46.

58. The court held a hearing on the preliminary injunction motion on September 5, 2001. At the hearing, Lone Star explained that the flooding occurred because the contractor hired to pump the pond had failed to do so. The court granted the motion and entered an order on September 5, 2001 prohibiting Lone Star from allowing the discharge of water from Lone Star's property onto BCH's property. Def. Exh. 47.

Liberty Mutual was fully advised of the events relating to the preliminary injunction.

59. Lone Star filed an affidavit in response to the motion for preliminary injunction which stated that Lone Star's new engineer, Malcolm Pirnie, had been working for several months to design an improved system to handle the water flow. The affidavit also indicated that construction of the improved system was projected to begin approximately 60 days from August 29, 2001 after completion of a final design, approval by the City, and bidding for the contract.

During this period, Lone Star continued its contract with Hoffman Brothers to make sure water was pumped out of the basin if necessary.

60. On October 29, 2001, Kurt Tribbett of the City of Battle Creek Engineering Division sent a letter to Malcolm Pirnie in response to Pirnie's question about requirements for containment of oil and grease in a proposed pumping station at the site.

61. Robert Koltuniak provided an expert opinion to Plunkett & Cooney on December 20, 2001, on the causes of the flooding to the north of the Lone Star restaurant. He identified five specific contributing factors: (1) the BCH Holiday Inn site was developed without proper engineering for stormwater management; (2) the subsurface infiltration sewer installed by BCH was not properly designed to convey stormwater from the area to the northeast of the Lone Star property; (3) stormwater control structures on the BCH property were not properly maintained; (4) the original Lone Star pond design was undersized for handling a 100–year storm volume [3]; and (5) the accumulation of sediment and vegetative growth within the Lone Star basin reduced its overall capacity, although he said this condition was alleviated when Lone Star had the basin excavated and hired a contractor to periodically divert stormwater from the basin. Def. Exh. 50.

Koltuniak also noted Lone Star had proposed a plan in January 2000 to increase the size of the basin to contain a 100–year rainfall, but BCH had denied the necessary easements for that plan and requested an alternative that included pumping accumulated stormwater away from the site. *Id.*

62. The 2000 case was scheduled for case evaluation for January 17, 2002. BCH's case evaluation statement asserted that plaintiff sought damages from Lone Star as a result of Lone Star's trespass onto BCH's property.

3. Koltuniak stated that although no there were no criteria requiring the basin to meet a 100–year storm capacity, meeting that capacity would be reasonable in light of the fact there was no engineering outlet from the ba-sin. He noted that the original design capacity was 6,144 cubic feet, while the City of Battle Creek had estimated that the capacity required for a 100–year storm was 19,985 cubic feet.

63. BCH alleged that Lone Star had caused damage to BCH through repeated incidents of flooding and that Lone Star had only taken short-term measures in March 2000 which did nothing.

64. BCH also alleged that Lone Star's own experts admitted that its basin had insufficient capacity from its installation, and that to control the stormwater would require Lone Star to increase the size of the basin, thereby decreasing the number of parking spaces available to Lone Star.

65. The case evaluation award was in the amount of $270,000.

Lisa Luckritz, claim specialist with Liberty Mutual, recommended acceptance of the case evaluation award. Pl. Exh. I at 128. Joe Covert, a chief examiner for Liberty Mutual, decided to reject the case evaluation award on February 18, 2002, based on questions he had about coverage. Pl. Exh. E at 74. This was Covert's first involvement in the case.

66. As noted above, BCH filed a supplemental complaint on February 4, 2002, alleging eight incidents of additional flooding. Def. Exh. 39.

67. In response to a request from Liberty Mutual for his evaluation of the 2000 case, attorney Keith Schofner of Plunkett & Cooney sent a message to Lisa Luckritz on February 13, 2002. He stated that BCH could prove that water entered the hotel from Lone Star's property on at least some of the dates alleged. He noted that BCH was claiming total damages of $6.4 million—$3.7 million for diminution in value of the hotel due to flooding, $1.2 million from loss of franchise, $700,000 in "debranding damages," and at least $150,000 in physical damages. He said Lone Star's arguments would be that the damages are inflated, that the loss of franchise was not the result of water damage caused by Lone Star, that the water damage (especially after the basin was dredged) are the result of plaintiff's own water and/or poor management, and that loss of room revenue cannot be substantiated or attributed to Lone Star.

Schofner recommended accepting the mediation award of $270,000 based on the risk involved and the fact that BCH would be able to prove some physical damages relating to cleaning and replacement of carpeting, et cetera. He believed that Lone Star would essentially be "trying to prove a negative"—that is, that the water damage did not cause the loss in value of the hotel or the loss of the franchise, although he pointed out that Lone Star would argue these problems were attributable to poor management, increased competition from new Holiday Inn Express hotels nearby, and the downturn in the economy.. Def. Exh. 53.

68. Schofner sent Luckritz a letter on February 28, 2002 which followed up a prior phone conversation. The letter outlined the trial strategy for Lone Star and detailed the discovery to be conducted in upcoming weeks. Among other things, Schofner said he would meet with engineering experts to get calculations concerning the water volume from BCH's roof, piping system and property. He said he wanted "to provide further support for that fact that we believe that water problems are largely due to their own causes." He also noted there was a substantial risk factor in the case with BCH asking for $6.4 million in damages. He opined that BCH's weakness to this point had been its inability to tie the loss of its franchise to the water problems, but cautioned they might be able to do so, pointing out that the Holiday Inn licensor who had terminated BCH's agreement had an incentive to support BCH's so as to avoid a wrongful termination claim by BCH. Def. Exh. 54.

69. The 2000 case was set for a facilitation hearing on May 7, 2002. On or around May 1, 1002, attorney Keith Schofner sent his evaluation of the 2000 case to Liberty Mutual. After reviewing the claims, Schofner stated: "As we have indicated in the past, we believe this case contains a very high risk of exposure. If the case goes to trial, we would obviously be presenting a number of possible factual defenses to the matter. There is clear liability in the case. The only question is what will the amount of damages be?" Schofner recommended that Liberty Mutual increase its loss reserve to at least $750,000, again pointing out the substantial risk and noting that if the judge found Lone Star was only 20% responsible for the claimed damages, the recovery would still be in excess of $1 million. Def. Exh. 55.

70. Lone Star's general counsel sent correspondence the following day, May 2, 2002, to Lone Star's excess carrier providing notice of the claim. He described the claim as "alleged damages as a result of trespasses to land...." Def. Exh. 56.

71. Attorney William Booth of Plunkett & Cooney sent correspondence to Liberty Mutual on May 3, 2002 summarizing the testimony of witnesses, and once again recommending an increase of the loss reserve to at least $750,000. He noted, "Because of the uncertainty in this case, and that the plaintiff will be able to prove that the retention basin did overflow, it is recommended that you be prepared to have settlement authority in the range of $700,000 to $750,000 at this time." Def. Exh. 57.

Within a day or two of receiving Plunkett & Cooney's recommendation that the loss reserve be increased to $750,000, Liberty Mutual decided it was going to deny coverage to Lone Star on BCH's claims. Pl. Exh. I at 208–10.

72. On May 3, 2002, a phone conference was held between Lisa Luckritz of Liberty Mutual, Karon Perrill and Gerald Aaron of Lone Star, and attorney William Booth. Luckritz informed them that Liberty Mutual was denying coverage. Later that day, Lone Star's general counsel Gerald Aaron wrote Luckritz a letter asserting that Liberty Mutual's denial of coverage was an act of bad faith, a conclusion which he said was strengthened by Liberty Mutual's offer to "participate in any settlement up to 20% of the amount paid." Def. Exh. 58.

73. Lisa Luckritz of Liberty Mutual responded by correspondence of May 6, 2002, denying the charge of bad faith. She said Liberty Mutual had defended the first action and paid the $95,000 settlement, and then provided a defense to the second action at a cost of $224,119. She said that from the inception of the current action, Liberty Mutual had provided a reservation of rights letter on April 23, 2001 and an updated letter on March 25, 2002, and that the law allowed the insurer to assert coverage defenses pursuant to these letters.

74. At the facilitation on May 7, 2002, Liberty Mutual said it would agree to contribute 20% of a settlement of up to $750,000, or a maximum of $150,000. Pl. Exh. V. During the facilitation, it never represented that it would increase that amount. After the facilitation, Liberty Mutual represented that it would be willing to increase its contribution to a total of 20% of $910,000 (i.e., $182,000) only in exchange for a full and final settlement of Lone Star's potential declaratory judgment and bad faith action against Liberty Mutual. *Id.* Lone Star refused this offer.

75. In response to a letter from William Booth of Cooney & Plunkett asserting that there was Lone Star was entitled to coverage under the policy, Lisa Luckritz of Liberty Mutual wrote Booth on May 13,

2002 stating there was no coverage because BCH's claims were based on nuisance, trespass, and injunctive relief and did not include claims or allegations of negligence. She asserted that BCH's case evaluation only referred to intentional—not negligent—acts by Lone Star, and that Lone Star's determination to save money by not hooking up to the city's storm sewer had resulted in multiple flooding incidents. Because Lone Star's intentional acts created the risk of harm, Luckritz said, there was no "occurrence" or "accident" within the meaning of the policy. Def. Exh. 60. Luckritz also claimed Liberty Mutual had not been advised that the first settlement would not release all of the claims against Lone Star or that Lone Star was already subject to liability at that time for additional flooding. She also complained that, "contrary to Liberty Mutual's multiple requests," Booth had failed to put Wolfgang Doerschlag Architects on notice of the claim or make them a party although they were potentially liable for designing an undersized retention basin.

There is evidence in the record that Liberty Mutual was aware of the facts when new flooding incidents were alleged by BCH. Also, there is evidence that Liberty Mutual was fully advised of the effect of the mediation of the 1998 lawsuit.

*Lone Star's Additional Statement of Facts.*

1. The underlying factual basis of the claims alleged by BCH, i.e., overflow of water from Lone Star's property, did not change from the beginning of the 1998 case through the end of the second case in 2002. Prior to the filing of the 2000 case, Liberty Mutual was aware of allegations of continued flooding. See e.g. Pl. Exh. E at LM 171.

2. At the end of the 1998 lawsuit, Lone Star took steps to improve the stormwater basin on its property through the retention of experts to design and improve the stormwater management system. It examined remedial measures, including dredging and deepening the basin, extending the berm, and pumping the pond when it rained. There were delays in designing an acceptable system, in part due to BCH's opposition to some of the proposed measures, and Lone Star continued to seek an improved system throughout the 2000 lawsuit. After the settlement of the 1998 lawsuit, Lone Star spent $267,166.85 maintaining, re-designing and improving the stormwater basin, including payment of $33,745.50 to its contractor, Hoffman Brothers, to have the stormwater basin pumped every time it rained. Pl. Exh. B.

3. Upon notice of the filing of the 2000 lawsuit on or about February 1, 2000, Liberty Mutual authorized Plunkett & Cooney to accept service on behalf of Lone Star and issued no notice of a reservation of rights. Pl. Exh. J. Liberty Mutual handled the 2000 lawsuit as arising out of the original claim falling under the policy issued in 1997. Pl. Exh. E at LM 216. Liberty Mutual renewed the policy in 1998, 1999, 2000, 2001 and 2002 without any condition or exclusion based on the claims in the Michigan cases. Pl. Exh. B, ¶ 12.

4. Liberty Mutual was the primary contact for Plunkett & Cooney, and Liberty Mutual controlled the defense of the 2000 lawsuit. *See* Pl. Exh. G at 10 and 131–33.

5. According to Lone Star, it was prejudiced by Liberty Mutual's initial assumption of the defense of the 2000 case without any indication of a coverage issue and its later denial of coverage because: (1) Lone Star would have been more involved in the defense of the 2000 case; (2) it would have pursued settlement negotiations at an earlier time and explored early settlement options; (3) it could have secured experts

in a more timely manner and ensured appropriate evaluation of all possible issues in the case; and (4) it could have pursued claims it may have had against the engineering firm that improperly designed the original stormwater basin. Pl. Exh. B, ¶ 5.

6. The reservation of rights letters issued by Liberty Mutual in April 2001 and March 2002 did not say anything about a lack of coverage under the "loss in progress" doctrine. Def. Exhs. 33 & 34.

7. Liberty Mutual was—or through the exercise of reasonable diligence could have been—fully aware of the facts pertaining to coverage throughout the 1998 and 2000 lawsuits.

8. Liberty Mutual's policies provide that determination of coverage issues should be done with a sense of urgency and should be accomplished within at least 30 days. Pl. Exh. I at 120–23.

9. As previously noted, Lone Star took several remedial steps after settlement of the 1998 lawsuit. Viewing this and the other evidence in the record in the light most favorable to Lone Star, a reasonable jury could find that Lone Star did not expect or intend that water runoff from its detention basin would cause damages to BCH after such measures were taken.

10. The Liberty Mutual claim managers who handled the underlying cases from 1998 through April 2001 believed BCH's claims against Lone Star were covered by the policy. Pl. Exh. I at 179–80. The attorneys at Plunkett & Cooney likewise believed there was coverage. Pl. Exh. I.

11. In the settlement agreement concluding the 2000 lawsuit, BCH agreed:

[T]hat the allegations contained within its Complaint were founded upon the negligence of Lone Star in failing to adequately design and properly maintain and repair the retention basin and the associated storm water management facilities, including the berm and/or swale and were not founded upon any intentional acts of Lone Star, even though, such claim was identified in the complaints as trespass and nuisance. The basis for this settlement is entirely upon the negligence aspects of the claim and that any such intentional act, even if it had been alleged, is hereby waived. Further, in the judgment of [BCH] any damage to [BCH] was as a result of an accident or accidents that could not have been expected or intended by Lone Star. Pl. Exh. Z, ¶ G.[4]

III. *Summary Judgment Standards.*

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if

---

4. Liberty Mutual argues that this stipulation should have no impact on a determination of whether BCH's 2000 claims were based upon negligent or intentional conduct. The court agrees with Liberty Mutual on this point, but cannot agree that BCH's claims were necessarily based solely on intentional rather than negligent acts. Nothing in BCH's pleadings suggests it intended to exclude negligently-caused trespass or nuisance from its claims against Lone Star. *See* Def. Exh. 31. *Cf. Lofland v. Sedgwick County,* 26 Kan.App.2d 697, 699, 996 P.2d 334 (1999) (a trespass or a nuisance can be intentional, the result of a defendant's negligence, or based on strict liability for an abnormally dangerous activity); and *Iacobelli Const. Co., Inc. v. Western Cas. & Sur. Co.,* 130 Mich.App. 255, 343 N.W.2d 517, 520–21 (1983). *See also* Def. Exh. 51 at Pp. 1 & 9 ("The trespass occurred as a result of [Lone Star's] alteration of the natural flow of water and by failing to properly manage the storm water flow from its property thereby allowing it to enter onto [BCH's] property. * * * [There] is no doubt the flooding is the direct result of [Lone Star's] actions and inactions.").

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* A disputed fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Because it is the role of a jury—not a judge—to resolve any conflicts in the evidence, the court must examine the evidence on a motion for summary judgment in the light most favorable to the non-moving party. *Jones v. Unisys Corp.,* 54 F.3d 624, 628 (10th Cir.1995). Stated otherwise, summary judgment is proper only when the evidence is such that no reasonable jury could find for the non-moving party under the governing law.

### IV. *Summary of Arguments.*

Liberty Mutual first contends there was no insurance coverage for BCH's claims against Lone Star in the 2002 lawsuit because those claims did not arise from an "occurrence" or "accident" within the meaning of the policy. Pointing out that the term "accident" has been construed to mean "an undesigned, sudden and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force," Liberty Mutual argues that the continued flooding of BCH's property does not fall within this standard because Lone Star was well aware of the problem prior to the 2000 lawsuit, it knew the flooding would continue unless an adequate water retention system were put in place, and it knowingly failed to take the steps necessary to reme-

dy the problem. Thus, the flooding "was not the result of any undesigned, unexpected event or happening by chance," but was the "natural and probable consequence, reasonably foreseeable and direct risk of Lone Star's inaction and refusal to correct and end the repeated flooding of BCH's property,..." Def. Br. at 21. Liberty Mutual cites a number of cases in support of the proposition that when an insured has been alerted to a problem, the cause of the problem, and the likelihood of recurrence, the insured cannot ignore the problem and then seek recovery from its insurer. *See e.g., City of Carter Lake v. Aetna Casualty,* 604 F.2d 1052 (8th Cir. 1979) (first incident of sewage backup was an "occurrence" but subsequent episodes were not, because there was a substantial probability of another backup unless remedial action was taken, and the insured took a calculated risk and elected to continue operations without correcting its methods). For largely the same reasons, Liberty Mutual argues coverage is barred under a policy exclusion for property damage "expected or intended from the standpoint of the insured," because the repeated flooding of BCH's property was a "natural and probable consequence" of Lone Star's continued operation of an inadequate water retention system. Lastly, Liberty Mutual argues coverage is barred under the "loss in progress" or "known loss doctrine," which provides that a loss should not be covered if it was in progress and known to the insured at the time the policy was issued. *Citing Inland Waters Pollution Control v. Nat'l. Union Fire Ins.,* 997 F.2d 172 (6th Cir.1993).

### V. *Discussion.*

■■■ A federal court exercising diversity jurisdiction must apply the substantive law of the state in which it sits, including the state's choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487,

495–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Kansas follows the rule of "lex loci contractus," meaning the law of the place where the contract was made governs interpretation of the contract. *See Gillespie v. Seymour*, 19 Kan.App.2d 754, 763, 876 P.2d 193 (1994). Both parties agree that the contract was issued to Lone Star in Wichita, Kansas. Given this uncontroverted fact, and the absence of any contrary evidence, the court finds that the contract was made in Kansas and that Kansas law governs. *Cf. Gen. Electric Capital Corp. v. Dodson Aviation, Inc.*, 286 F.Supp.2d 1307, 1313 (D.Kan.2003) (contract is made where last act necessary for formation occurred).

■ Under Kansas law, an insurance policy is to be interpreted "in a way that will give effect to the intention of the parties." *Brumley v. Lee*, 265 Kan. 810, 963 P.2d 1224, 1226 (1998). "If the language is ambiguous, the construction most favorable to the insured must prevail." *Id.* Where there are no ambiguities in the policy, the court "must enforce the unambiguous language according to its plain, ordinary and popular sense." *Cessna Aircraft Co. v. Hartford Accident & Indemnity Co.*, 900 F.Supp. 1489, 1497 (D.Kan. 1995).

■ The policy issued to Lone Star provided coverage for property damage caused by an "occurrence," which was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." As typically used, the term "accident" refers to an "undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by

a manifestation of force." *Harris v. Richards*, 254 Kan. 549, Syl. ¶ 3, 867 P.2d 325 (1994). The scope of "accident" coverage in this instance was further delineated by a specific exclusion for property damage "expected or intended from the standpoint of the insured."

■ The cases cited by the parties dealing with this type of coverage make two points clear. First, when an insured acts for the specific purpose of causing property damage, the resulting damage cannot be said to be caused by an accident. *Cf. Fidelity & Deposit Co. of Maryland v. Hartford Cas. Ins. Co.*, 189 F.Supp.2d 1212, (D.Kan.2002) (the key to determining whether there is an "occurrence" is whether the resulting damage, not the act that led to the damage, was intentionally caused by the insured); *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 512 P.2d 403, 408 (1973) ("Under this policy, coverage is avoided only when an act results in an intentional injury").[5] Second—and more to the point in this case—an insured who is alerted to a problem of ongoing property damage, its cause, and the likelihood of recurrence, cannot simply ignore the problem and then claim that any resulting future damage is an "accident" for which the insurer is liable. *See Carter Lake v. Aetna Casualty*, 604 F.2d 1052 (8th Cir.1979) (where sewer repeatedly backed up causing damage, damage was "expected or intended" because the insured failed to take any remedial steps despite knowledge to a substantial probability that the damage would reoccur). In such a case, the damage is expected or intended because the insured knows full well the damage will continue

---

5. Direct evidence of a specific intent to cause damage is not necessarily required. Such intent may be inferred if the resulting damage is the natural and probable consequence of the insured's act. *Cf. Harris v. Richards, 254*

Kan. 549, 867 P.2d 325 (1994) (intent to cause bodily injury inferred from insured's act in firing shotgun into cab of occupied pickup truck).

until remedial action is taken. On the other hand, damage from a known recurring condition may nevertheless be considered an "accident" where the insured took remedial steps that were designed to prevent the damage from reoccurring. *See Potomac Ins. of Illinois v. Huang*, 2002 WL 418008 (D.Kan., Mar.1, 2002) (property damage from windows that repeatedly leaked, including after attempted repairs, was due to "accident" because the insured "hoped and expected that its remedial efforts would prevent subsequent incidents of the same nature."); *American States Ins. Co. v. Powers*, 262 F.Supp.2d 1245, 1249 (D.Kan.2003) (to the extent "occurrence" is ambiguous it must be construed favorably to the insured; Kansas Supreme Court would find that damage occurring as a result of faulty or negligent workmanship constitutes an "occurrence" as long as the insured did not intend for the damage to occur).

█ Applying these principles to the record now before it, the court concludes that Liberty Mutual's motion for summary judgment must be denied. As an initial matter, the court believes that Liberty Mutual has somewhat overstated Lone Star's alleged certainty that it was the cause of the property damages claimed in the 2000 lawsuit. Liberty Mutual accepts at face value allegations made by BCH in the course of that litigation, and it employs hindsight to argue that Lone Star must have known all along the basin was the cause of the damages. It is true that Lone Star was aware early on that its detention basin was only one-third of the capacity required to handle a 100–year rainfall, contrary to what WDA had represented when it designed the basin. But there was apparently no legal requirement that the basin meet the 100–year rainfall standard. It is also true that Lone Star was aware that the basin had overflowed onto BCH's

property, and that the settlement of the 1998 lawsuit put Lone Star on notice that the basin had caused flooding damages to BCH. But Liberty Mutual ignores conflicting evidence available to Lone Star from which it could have reasonably believed that flooding or claimed damages in BCH's 2000 lawsuit resulted not from the basin, but from problems on BCH's own property. Such conflicting evidence relating to Lone Star's knowledge during the pendency of the 2000 lawsuit weighs against a grant of summary judgment. *Cf. City of Carter Lake*, 604 F.2d at 1059, n. 4 ("The indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications must also be sufficient to forewarn him that the results are highly likely to occur."); *see also Bell v. Tilton*, 234 Kan. 461, 674 P.2d 468 (1983) (damages excluded as "intentional" where the insured believed the damage was substantially certain to result from his actions). Even less tenable for summary judgment purposes is Liberty Mutual's contention that Lone Star failed to take any remedial action after learning that the basin was a cause of the damages. There is ample evidence in the record to create a genuine issue of fact on that question. The 1998 lawsuit, which was defended and paid by Liberty Mutual without reservation, was settled on or about November 1, 1999. The judge's final order in that case stated that BCH was not precluded from seeking additional damages for any flooding occurring after September 20, 1999. Within a few days of the settlement, McLaren–Hart began work, at Lone Star's request, to develop a proposal for improvement of the Lone Star site. In December of 1999, attorney Henson engaged in negotiations with BCH's attorney about easements that might be necessary to make improvements. In February 2000, McLaren–Hart sent a report to BCH's engineer explaining

the proposed improvements, followed by a meeting at the site on March 2, 2000. On March 3, 2000, McLaren–Hart reported to Lone Star that BCH would not accept the Lone Star proposals. In that report, McLaren–Hart recommended that temporary measures be taken by Lone Star to prevent future damage until a more permanent solution could be found. On March 9, 2000, in response to this recommendation, Lone Star had the retention basin dredged and deepened. It also installed a concrete manhole to facilitate pumping, and it contracted with an excavator to pump the basin as needed to prevent flooding. Lone Star's engineer, Robert Koltuniak of McLaren–Hart, thereafter continued discussions with BCH's engineer in an effort to reach an accommodation on proposed improvements. In June of 2000, Lone Star extended and increased the size of the berm leading to the basin. It is uncontroverted that after the settlement of the 1998 lawsuit, Lone Star spent a total of $267,166.85 maintaining, re-designing and improving the stormwater basin. Liberty Mutual has not established as an uncontroverted fact that Lone Star undertook these remedial efforts in bad faith or with an awareness that they would not prevent further damages.

■ This is materially different from the insured in *Carter Lake* who "took the calculated risk that [the damage] would not occur, and elected to continue operations without correcting its methods." A reasonable jury viewing the evidence in a light favorable to Lone Star could conclude that Lone Star made good faith efforts to remedy the problem, and that property damage incurred by BCH in the 2000 lawsuit, or at least some portion thereof, was due to an accident that was not expected or intended by Lone Star. *Cf. Fidelity & Dep. Co. of Maryland v. Hartford Cas. Ins. Co.*, 189 F.Supp.2d 1212, 1218 (D.Kan.

2002) (damage resulting from faulty or negligent workmanship constitutes an "occurrence" as long as the insured did not intend for the damage to occur). Similarly, a reasonable jury could find that when the policy was issued or renewed, Lone Star did not know that such a loss to BCH was going to occur. *Cf. Inland Waters Pollution Control, Inc. v. Nat'l. Union Fire Ins.*, 997 F.2d 172, 178 (6th Cir.1993) ("loss in progress" doctrine requires foreknowledge of loss or an awareness of an immediate threat of loss on the part of the insured). As such, Liberty Mutual's motion for summary judgment must be denied.

■ In addition to the foregoing, the court finds there are genuine issues of fact as to whether Liberty Mutual should be barred from denying coverage by virtue of estoppel. Kansas courts recognize that estoppel may arise from an insurer's failure to make a timely and proper reservation of rights:

> [I]f a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage. The insurer's conduct in this respect operates as an estoppel to later contest an action upon the policy, regardless of the fact that there has been no misrepresentation or concealment of material facts on its part, and notwithstanding the facts may have been within the knowledge of the insured equally as well as within the knowledge of the insurer.

*Snedker v. Derby Oil Co.*, 164 Kan. 640, 192 P.2d 135, 137 (1948) (quoting 29 AM. JUR. 672, § 878). *See also Bogle v. Con-*

*way,* 199 Kan. 707, 433 P.2d 407, 412 (1967). This rule "prevents an insurance company from taking over the defense of a matter but avoiding the coverage of the end result, without an adequate reservation and warning to the insured. That way, the insured can make its own decision regarding the need for independent defense counsel." *Golf Course Superintendents Ass'n of America v. Underwriters at Lloyd's, London,* 761 F.Supp. 1485, 1492 (D.Kan.1991); *Bogle,* 433 P.2d at 412 ("the position of the insurance carrier in not wishing to waive nor be estopped to set up its rights by defending the action against the insured, to be effective, must be made clear to the insured so that he may make an intelligent decision whether to consent to the assumption of his defense and the control of his lawsuit by the carrier, or to take another course. * * * In either case, the insured must be fairly and timely informed of the insurer's position.").

■ A plaintiff asserting equitable estoppel must show that the other party, by acts, representations, admissions, or silence when it had a duty to speak, induced the plaintiff to believe certain facts existed. The plaintiff must also show that it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. *Gillespie v. Seymour,* 250 Kan. 123, 129, 823 P.2d 782 (1991). Lone Star has cited evidence that, if accepted by the trier of fact, could establish the elements of estoppel. As an initial matter, there is conflicting evidence as to whether the defense of the 2000 BCH lawsuit was controlled by Lone Star or by Liberty Mutual. Moreover, given that Liberty Mutual provided coverage for the 1998 claims by BCH and then waited some 14 months after the 2000 lawsuit was filed to send an initial reservation of rights letter, a jury could find that Liberty Mutual failed to timely notify Lone Star of the possibility of non-coverage. A jury could further find that Lone Star was prejudiced by this failure because it refrained from pursuing a different course of action—including an early settlement of the 2000 claims—in reliance upon Liberty Mutual's apparent representation that the claims were within the policy's coverage and that Liberty Mutual would adequately defend the claims. *Cf. Golf Course Superintendents,* 761 F.Supp. at 1493 (noting prejudice may be inferred where insurer controls defense because of possible conflict of interest between the policy defense of the insurer and the defense of the damage action against the insured).

Liberty Mutual argues that Lone Star does not have "clean hands" and should not be allowed to claim equitable estoppel. It contends Lone Star knowingly made false or misleading statements in the course of the BCH litigation, both to the court and to Liberty Mutual. This argument, however, fails to take into account the summary judgment standard requiring the court to consider all of the evidence, and all reasonable inferences from the evidence, in the light most favorable to Lone Star. Perhaps a jury would find convincing Liberty Mutual's contention that Lone Star knowingly misrepresented facts as part of a "hardball" litigation strategy, but the circumstances underlying this contention are in dispute and are not a proper basis for summary judgment.

■ Finally, the court concludes that genuine issues of fact remain as to Lone Star's claim that Liberty Mutual breached the obligation of good faith and fair dealing implied in the insurance contract. Under Kansas law, a duty of good faith and fair dealing is implied in every contract. *Daniels v. Army Nat'l Bank,* 249 Kan. 654, 658, 822 P.2d 39, 43 (1991). This duty requires the parties to an agree-

ment to refrain from intentionally and purposely doing anything to prevent the other party from carrying out its part of the agreement, or doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Id.* (*quoting Bonanza, Inc. v. McLean,* 242 Kan. 209, 222, 747 P.2d 792 (1987)). As the court noted previously in this case, "an insurance contract contains an implied term that if the insurer assumes the defense of an insured, then the insurer 'owes to an insured the duty to act in good faith and without negligence.'" *Aves By and Through Aves v. Shah,* 258 Kan. 506, 906 P.2d 642, 648 (1995) (*quoting Bollinger v. Nuss,* 202 Kan. 326, Syl. ¶ 1, 449 P.2d 502 (1969)). In *Associated Wholesale Grocers, Inc. v. Americold Corp.,* 261 Kan. 806, 846, 934 P.2d 65, 90 (1997), the court identified the following factors as relevant in evaluating a claim that the insurer breached the obligation of good faith in connection with a denial of coverage: (1) whether the insured was able to obtain a reservation of rights; (2) efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way to limit any potential prejudice to the insured; (3) the substance of the coverage dispute or the weight of legal authority on the coverage issue; (4) the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage; and (5) efforts made by the insurer to settle the liability claim in the face of the coverage dispute.

 The evidence cited by Lone Star raises a genuine issue of fact as whether Liberty Mutual acted in good faith in connection with its denial of coverage for the 2000 BCH lawsuit damages. Specifically, Lone Star has cited evidence from which a jury could find that Liberty Mutual belatedly decided to deny coverage—not based upon some new evidence suggesting that the damages were outside the scope of coverage—but because it realized the damages could be much greater than it anticipated. Lone Star has cited evidence that the claims officers who originally handled the 2000 lawsuit believed the BCH claims were covered by the policy, but that within a day or two of receiving Plunkett & Cooney's recommendation that the loss reserve be increased to $750,000, Liberty Mutual decided to deny coverage. When the denial was questioned, Liberty Mutual responded with a letter containing what a jury could find were false assertions, including claims that Liberty Mutual had not been fully advised of the circumstances surrounding settlement of the 1998 lawsuit, that BCH's 2000 case evaluation alleged only intentional and not negligent conduct on the part of Lone Star (and the implication that coverage applied only if "negligence" were specifically alleged), and that Liberty Mutual had "continually questioned" why the architect responsible for the design of the retention basin was not brought into the suit. Def. Exh. 60. Also, Lone Star has cited evidence that Liberty Mutual failed to timely inform Lone Star of its reservation of rights and its denial of coverage, that it failed to provide a consistent and reasonable explanation for its denial of coverage, and that it failed to use good faith efforts to attempt a settlement of the 2000 claims against Lone Star. Viewing such evidence in a light favorable to Lone Star, a reasonable jury could conclude that Liberty Mutual failed to deal honestly and fairly with Lone Star in connection with the 2000 BCH lawsuit. *Cf. Restatement (Second) of Contracts, § 205, comment d* ("Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified."). Accordingly, defendant's motion for summary judgment must be denied.

## VI. *Motions in Limine.*

Each of the parties has filed a motion in limine seeking to exclude expert testimony from the other side. Lone Star moves to exclude testimony from defendant's designated expert, George L Priest, arguing that Priest's testimony would not assist the trier of fact. Specifically, Lone Star argues that Priest's report shows he would improperly construe the term "occurrence" in the policy to reflect economic considerations affecting the insurer, something Lone Star argues is at odds with the law requiring the policy to be construed from the standpoint of a reasonable insured. Lone Star further argues that Priest would attempt to improperly inject a new term into the policy—namely, a requirement that the damages be "probabilistic" to be covered. Again, Lone Star argues this is contrary to established rules of interpretation. Liberty Mutual, meanwhile, seeks to exclude testimony from Donald Dinsmore, a former insurance adjustor and supervisor (and now attorney), whom Lone Star has designated as an expert. It argues that Dinsmore is not qualified to render an expert opinion on the matters contained in his report, that his testimony includes impermissible conclusions of law, and that his opinions relating to the Kansas Uniform Trade Practices Act are irrelevant because Lone Star has not alleged any violations of that act.

■ Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2)

> the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science." Fed.R.Evid. 702, *Adv. Comm. Notes;* see also *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The benchmark of Rule 702 is helpfulness of the expert testimony, a condition that goes primarily to relevance. *See BioCore, Inc. v. Khosrowshahi,* 183 F.R.D. 695, 699 (D.Kan. 1998). Thus, the Court must determine whether the proffered evidence would be helpful to the trier of fact. *See id.* at 699. In doing so, the Court examines specific subject areas of proposed expert testimony to ascertain whether each is sufficiently tied to the facts of the case so that it will be helpful to the fact finder. *See id.* Any doubts should be resolved in favor of admissibility. *See id. See also Employers Reinsurance Corp. v. Mid–Continent Cas. Co.,* 202 F.Supp.2d 1212, 1215 (D.Kan. 2002).

### A. Lone Star's Motion to Exclude Testimony of George L. Priest.

■ Liberty Mutual's designated expert, George L. Priest, has been a professor at Yale Law School since 1980. *See* Doc. 87, Exh. B. His field of research has been law and economics, and he has published numerous articles on law, economics, and insurance. He has taught, conducted research, and published in the area of insurance and insurance regulation.

His articles have appeared in economics and insurance journals, and he serves as a peer review referee for professional publications in those fields. He has testified before Congress and state legislatures on insurance issues and has lectured on insurance-related topics in educational seminars for state and federal judges. He has provided expert testimony on insurance issues in numerous federal courts. He has written extensively on the economic determinants of the terms in property and casualty insurance policies.

In his expert report, Professor Priest has addressed the economic consequences of interpreting the policy as Lone Star suggests to provide coverage for damage caused by repeated flooding of a neighboring property. Doc. 87, Exh. B at 4. Among other things, Mr. Priest opines that insurance can only be provided under two conditions: (1) if the losses have some "probabilistic character"—that is, where there is only some chance that the loss will occur over a particular period; and (2) if the chance of an accident is not within the direct control of the policyholder. Professor Priest states that absent these conditions, the insured would be immunized from the consequences of allowing a loss to occur, which would be wasteful and in violation of public policy. He explains that policy terms requiring that property damage be the result of an "accident" and excluding coverage for damage "expected or intended by the insured" are the contractual means by which the aforementioned conditions are included in insurance policies. *Id.* at 5–7.

Relying upon a statement of facts that he derived from the record, Mr. Priest further concludes that the flooding damages sustained by BCH in the 2000 lawsuit were not the result of an "occurrence" or "accident" within the meaning of Lone Star's policy because Lone Star "could have easily controlled the amount of damage that Holiday Inn suffered from the rain." *Id.* at 11. He states:

> It is difficult to imagine a clearer example of a context in which the damages at issue are directly within the control of the policyholder, but where the policyholder failed to take appropriate actions to prevent them. Just as in the case of a manufacturer which knowingly sells a defective product, Lone Star knowingly failed to redesign or repair the defective retention pond until after the second settlement with Holiday Inn. It would thwart the public policy goals of creating incentives for parties to prevent losses under their control if Lone Star were successful in shifting its responsibility for that harm to its insurer.

*Id.* at 12. *See also id. at p. 14* (summary and conclusions).

The court concludes that Lone Star's motion to exclude the testimony of Mr. Priest should be granted. As Lone Star points out, the subjective intent of an insurer does not control interpretation of the policy. Nor is the policy to be construed according to its potential economic effects or incentives. Rather, its terms are to be read as a reasonable person in the insured's position would have understood them. *Lapeka, Inc. v. Security Nat'l. Ins. Co., Inc.,* 814 F.Supp. 1540, 1544 (D.Kan.1993). To the extent there is any ambiguity in the term "accident" or the exclusion for damage "expected or intended" by the insured, the Kansas courts have construed these terms such that the court can adequately explain them to the jury. Expert testimony that the damages must be "probabilistic" to be covered would not, in the court's view, assist the jury in understanding these terms. *Cf. Koch v. Koch Indus., Inc.,* 2 F.Supp.2d 1385, 1401 n. 4 (D.Kan.1998) (absent any need to clarify or define terms of art,

science or trade, expert opinion testimony to interpret contract language is inadmissible). Nor would it assist the jury to hear an expert opinion that "insurance is not available where the determination of whether the loss occurs is within the direct decisional control of the policyholder." Such a condition does not appear in the policy. Moreover, the court believes such testimony would create confusion, given that insurance coverage for an "accident" may exist where the insured negligently failed to remedy a known source of property damage. *Cf. Potomac Ins. v. Huang,* 2002 WL 418008 (D.Kan., Mar.1, 2002) (losses were covered where insured had attempted, but failed, to repair the problem). *See also Fidelity & Dep. Co. of Maryland v. Hartford Cas. Ins. Co.,* 189 F.Supp.2d 1212, 1218 (D.Kan.2002) (damage from faulty or negligent workmanship constitutes an "occurrence" as long as the insured did not intend for the damage to occur). The court will instruct the jury in accordance with the *Carter Lake* standard. Under that standard, an insured who is alerted to a problem of ongoing property damage, its cause, and the likelihood of recurrence, cannot simply ignore the problem and then claim that any future damage is an "accident" for which the insurer is liable. But damage resulting from a known recurring condition may still be considered an "accident" where the insured took good faith remedial steps that were designed to prevent the damage from reoccurring. As applied to the facts of this case, these standards will require the jury to examine Lone Star's state of knowledge and whether it knew the claimed damages were substantially certain to occur. An expert opinion explaining this standard in terms of the "decisional control" of the insured would not aid the jury in understanding and resolving the issue. Nor would it assist the jury to hear Mr. Priest's opinion that Lone Star know-

ingly failed to take adequate remedial steps, because that is a factual matter upon which the jury will be fully capable of making its own findings. Accordingly, Lone Star's motion to exclude the testimony of George L. Priest is granted.

### B. Liberty Mutual's Motion to Exclude Testimony of Donald Dinsmore.

■ Donald L. Dinsmore has held a variety of positions in the insurance business, including insurance adjustor and claims supervisor, from 1969 to 1994. He has personally handled many insurance claims on GCL policies, including those involving water intrusion as a result of grading and site development. In 1997, he obtained a law degree from Stetson College in Florida, and he subsequently engaged in legal practice and consulting work. He currently operates his own consulting business. Since 1970, he has attended numerous insurance industry seminars and training programs. He has received designations as an Associate in Claims (AIC), Casualty Claims Law Associate, and Liability Claims Law Associate (P & CCLA). He has lectured on the topic of insurance in seminars approved for continuing legal education by the Florida Bar Association. He has testified as an expert and has prepared expert reports in a number of cases in both federal and state courts. He has presented two papers on insurance issues for the National Business Institute in Orlando, Florida.

Mr. Dinsmore's report contains a total of twenty-one enumerated opinions. Among other things, he concludes that BCH's claims for property damage in the 2000 lawsuit fell within the policy's coverage for an "occurrence"; that Liberty Mutual had no basis for concluding that Lone Star expected or intended any injury to BCH; that Liberty Mutual knew or should

have known of coverage questions relating to the 2000 lawsuit by or around February 1, 2000; that an insured should reasonably expect consistent claim handling from an insurer but that Liberty Mutual failed to consistently handle the 1998 lawsuit and the 2000 lawsuit; that the reservation of rights letter issued by Liberty Mutual 14 months after being notified of the 2000 lawsuit was not timely, and that its decision in May 2002 to deny coverage was not timely; that an insurer should promptly investigate and decide coverage issues; that Liberty Mutual failed to follow insurance industry standards for the handling of coverage issues; that Liberty Mutual is estopped to deny coverage for the BCH claims; that Liberty Mutual's May 13, 2002 letter denying coverage misrepresents the scope of the insurance coverage; and that Liberty Mutual violated several sections of the Kansas Unfair Trade Practices Act dealing with unfair claim settlement practices.

■ Liberty Mutual argues that Mr. Dinsmore is not qualified to offer expert testimony as an attorney or as a claims adjuster. In order to determine whether an expert opinion is admissible, the court must determine whether the individual is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *See* Fed.R.Evid. 702; *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir.2001). Based on Mr. Dinsmore's experience and training, including over 20 years' experience handling and supervising insurance claims, the court concludes he is qualified to express opin-

ions relating to insurance industry standards and practices and whether Liberty Mutual's conduct conformed to such standards. For example, he is qualified to explain claims handling practices generally and insurance industry standards relating to timely investigations, reservation of rights, and coverage determinations.[6] Moreover, the court concludes that such opinions may be relevant to Lone Star's claim that Liberty Mutual breached its implied obligation of good faith and fair dealing and its claim of estoppel.

■ On the other hand, the court agrees with Liberty Mutual that it would not assist the trier of fact for Mr. Dinsmore to offer opinions that BCH's damages in the 2000 lawsuit fell within the definition of an "occurrence"; or that Liberty Mutual had no basis to apply the exclusion for "expected or intended injury"; or that Liberty Mutual was inconsistent in its handling of the two lawsuits; or that Liberty Mutual is barred by estoppel from denying coverage. Such opinions involve either a construction of contract terms that can be adequately explained to the jury without expert testimony (as the court noted above in discussing Professor Priest's report), or they contain factual conclusions as to which a jury is fully qualified to make on its own determination from the evidence presented. *See Koch*, supra (absent need for testimony to clarify terms of art, expert testimony construing contract language is inadmissible). In either case, such testimony would not assist the trier of fact. Accordingly, Liberty Mutual's motion to exclude Mr. Dinsmore's

---

6. The court will reserve for trial the issue of whether Mr. Dinsmore can offer an opinion relating to the unfair claim settlement practices in the Unfair Trade Practices Act, K.S.A. § 40–2404(9). Although it is true, as Liberty Mutual points out, that Lone Star has not alleged a violation of the act in this case, the standards contained in the statute could con-

ceivably be relevant to whether Liberty Mutual breached the implied obligation of good faith and fair dealing. *See e.g., Walston v. Monumental Life Ins. Co.*, 129 Idaho 211, 923 P.2d 456 (1996) (testimony relating to unfair claim practices act was presented to show insurance industry standards and was properly admitted for that purpose).

testimony will be granted to the extent stated above.

VII. *Conclusion.*

Defendant Liberty Mutual's Motion for Summary Judgment (Doc. 91) is DENIED. Plaintiff Lone Star's Motion in Limine (Doc. 87) is GRANTED; Defendant Liberty Mutual's Motion in Limine (Doc. 89) is GRANTED in PART and DENIED in PART.